IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARY L. WHITE,                    )
          Plaintiff,              )
                                  )
          vs.                     )      Civil Action No. 00-2466
                                  )
SHAYEN A. GEORGE, M.A.,           )
          Defendant.              )      RE: Docket Nos. 160-1 & 160-2

## OPINION AND ORDER

HAY, Magistrate Judge

Presently before the Court for disposition is a motion for partial summary judgment and a motion for stay submitted on behalf of the defendant, Shayen A. George ("George").

Plaintiff, Mary L. White ("White"), commenced this action following a series of actions allegedly taken by George involving Associates in Child Guidance, Inc. ("ACG"), a closed corporation of which White and George are the sole shareholders, and Associates in Counseling and Child Guidance ("ACCG"), a non-profit corporation which White and George subsequently incorporated in order to become a totally independent operation. White complains that George has taken steps to "freeze her out" and take full control of both ACG and ACCG thereby breaching the contract she and George had entered into as well as the fiduciary duties owed to her and ACG.

According to the Complaint, White and George each own 50% of the outstanding stock of ACG, which provides therapeutic

staff support to emotionally disturbed or otherwise troubled youths between the ages of three and twenty-one.[1]  White acted as the President, Treasurer and Secretary of ACG and George was ACG's Vice President.[2]

It also appears that the services provided by ACG were paid for by the Commonwealth of Pennsylvania's Medical Assistance Program which ACG billed through George's psychologist license.[3] George's license, however, only permitted ACG to bill Medical Assistance for 120 hours of services each week which, in turn, prevented ACG from accepting all of its referrals and expanding its business.[4]  Consequently, White, with George's apparent approval, entered into a series of contracts with other mental health clinics under which the clinics would bill the Commonwealth for the services ACG provided to its clients.[5]  None of these arrangements lasted for any length of time, however, and in December of 1997, it was suggested to White and George by attorney Richard J. Gold ("Gold"), that they start their own non-

---

[1]    Complaint ¶¶ 1, 2, 10 (Docket No. 1).

[2]    Complaint ¶¶ 1, 2.

[3]    Complaint ¶¶ 10, 13.

[4]    Complaint ¶ 13.

[5]    Complaint ¶¶ 15-21.

profit clinic.[6]  As a result, ACCG was incorporated by White and George in January of 1997, and operations began sometime in December of 1998.[7]

To that end, White and George entered into a number of discussions with Gold in late 1998 and early 1999 regarding the relationship between the two corporations, how they would be organized and function, and what management roles and other duties White and George would perform.[8]  The results of these discussions were apparently memorialized in a letter from Gold to White and George wherein, according to the Complaint, it was agreed that ACG and ACCG would be separate corporate entities but with centralized services; that ACCG would be set up as a non-member corporation with a Board of Directors; that White and George would both share in the management of ACCG and consult with each other on all matters affecting the business operations of the two corporations; that George would act as the Executive Director of ACCG in charge of supervising the clinical aspect of each case as well as the Medical Directors and the Clinical Supervisors; that White would serve as the Administrative Director of ACCG supervising the non-clinicians, the marketing

---

[6]    Complaint ¶¶ 17, 20-23.

[7]    Complaint ¶ 24, 32.

[8]    Complaint ¶¶ 26-34.

actions and human resources as well as develop referral services, attend all therapy planning meetings and supervise some of the centralized services; that White would also be named vice president of ACCG; that White was to remain the head of ACG supervising the mental health workers who provided the therapeutic support to their clients; and that ACG would provide the staff for fee schedule services and child guidance services for ACCG.[9]

The first organizational meeting took place on March 5, 1999, at which time the Board of Directors was named and the by-laws were adopted.[10]  On that same date, the Board voted to name George as Executive Director and White as Administrative Director of ACCG and adopted their respective job descriptions.[11] In addition, it appears that the Board ratified the Independent Contractor Agreement that ACG and ACCG had entered into as part of the agreement arrived at between White and George.[12]  Under the terms of the Independent Contractor Agreement, ACG agreed to staff ACCG and ACCG agreed to make payments to ACG for their

---

[9]      _Id_.

[10]     Complaint ¶¶ 45, 46, 50.

[11]     Complaint ¶¶ 47-49.

[12]     Complaint ¶¶ 51, 52.

services.  Further, any profits from those payments would be distributed to ACCG's shareholders, White and George.[13]

Plaintiff alleges that since 1998, George has engaged in a course of conduct designed to take full control of both ACG and ACCG's operations, terminate the Independent Contractor Agreement, dissolve ACG thereby usurping White's clients who are the only source of revenue, and convert ACCG into a for-profit corporation.[14]  Plaintiff contends that George's actions are part of a scheme that he planned prior to their discussions with Gold and that George induced White to divide ACG into two corporations in order to carry out his plan.[15]

The instant Complaint was filed against George on December 19, 2000, wherein White has brought claims of Fraud (Count I); Breach of Contract (Count II); Breach of Warranty of Good Faith and Fair Dealing (Count III); Breach of Fiduciary Duties (Count IV); Accounting (Count V); Tortious Interference with White's Employment and Contractual Relationships (Count VI); "Freeze Out" (Count VII); Defamation (Count VIII); and Declaratory Judgment (Count IX).

---

[13]    Complaint ¶¶ 53-57.

[14]    Complaint ¶¶ 58-61, 63, 64-120.

[15]    Complaint ¶ 62, 125.

George has now filed a motion for partial summary judgment, arguing that White's claims for breach of contract and fraud brought in the first two Counts of the Complaint are subject to summary judgment because the oral contract upon which she has based her claims is illegal and, thus, unenforceable, and because White could not have justifiably relied upon George's alleged oral promises as they are contradicted by her attorney's advice and the Independent Contractor Agreement.

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ. P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial* ... or the factual record will

be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  Thus, it must be determined "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.

George initially argues that he is entitled to summary judgment on White's breach of contract claim brought at Count II of the Complaint since the oral agreement at issue is violative of the nonprofit corporation laws and the Public Welfare Act and, thus, is unenforceable.  With respect to the nonprofit corporation laws, George specifically argues that although a nonprofit corporation may earn an incidental profit, it may not be distributed to its members, directors or officers and because White has alleged that under the terms of the oral agreement "the revenue earned by ACCG was, by design and agreement, to be passed through to ACG," and distributed to her and George, it is illegal and, therefore, cannot be enforced.

7

White counters arguing that under the parties'
arrangement, ACCG was to operate as a nonprofit clinic for which
ACG would provide the staff and that ACCG would pay ACG for the
employees ACG provided to it.  White contends that any revenues
acquired by ACG would then be distributed to White and George as
shareholders in ACG and that because no monies have been
distributed to any shareholder of ACCG their agreement is not
illegal.

It appears undisputed that courts generally will not
enforce an illegal contract. Holst v. Butler, 379 Pa. 124, 131,
108 A.2d 740, 743 (1954), citing Tucker v. Binenstock, 310 Pa.
254, 259, 165 A. 247, 248 (1933).  It also appears undisputed
that under the Pennsylvania Business Corporation Law:

> A nonprofit corporation whose lawful
> activities involve among other things the
> charging of fees or prices for its services
> or products, shall have the right to receive
> such income and, in so doing, may make an
> incidental profit. All such incidental
> profits shall be applied to the maintenance
> and operation of the lawful activities of
> the corporation, and in no case shall be
> divided or distributed in any manner
> whatsoever among the members, directors, or
> officers of the corporation.

15 Pa. C.S.A. § 5545.  See 15 Pa. C.S.A. § 5103 (Defining
"Corporation not-for-profit" as "[a] corporation not incorporated
for a purpose or purposes involving pecuniary profit, incidental
or otherwise.")  See also In re Krassen-Luber Family Circle

8

Foundation, 71 Pa. D. & C. 353, 356 (1950)("[I]f the members of a corporation can obtain even incidentally a pecuniary profit by reason of their corporate organization, such a corporation is not a nonprofit one within the meaning of the Nonprofit Corporation Law.")

Here, notwithstanding White's assertion that revenue earned by ACCG was to be passed through to ACG, review of the Complaint as well as the Independent Contractor Agreement entered into between ACG and ACCG, demonstrates that ACG was to provide certain personnel or staff to work at ACCG for which ACCG agreed to pay ACG set amounts and that the revenue derived from those payments by ACG was to be distributed, after expenses, to ACG's shareholders, White and George.[16]  Thus, it appears clear that the corporate relationship was structured in such a way that ACG was merely being compensated for providing its staff to ACCG and that it was the revenue earned by ACG that was being distributed to ACG's shareholders.  Indeed, it appears undisputed that no monies were distributed to ACCG's shareholders or to White and George as ACCG's officers and directors.

Moreover, White has submitted the deposition testimony of attorney Gold who was involved in setting up similar

_____

[16]    Complaint ¶¶ 53, 54; Defendant's Exhibit B:
Independent Contractor Agreement, ¶¶ 3, 7 (Docket
No. 161).

relationships between clinics and staffing agencies and whom the parties employed to assist them in establishing ACCG and coordinating its relationship with ACG.[17]  Mr. Gold testified not only that it was everyone's understanding that ACG would provide wraparound staff to ACCG and that ACCG would then pay monies to ACG for providing that staff, but that there was nothing illegal or improper about this subcontractor relationship.[18]  Further, Mr. Gold testified that the revenue "earned" by ACCG was not money paid by clients directly to it for therapy services but represented monies reimbursed by the Commonwealth of Pennsylvania for the cost of the wraparound services.[19]  It therefore appears that while ACCG may have generated monies and while it may have paid ACG from those monies for the services ACG provided to it, the evidence of record suggests that it was not "earning revenue" in the sense that it was earning a profit for its own use or for distribution to its members, directors or officers.  Thus, to the extent that White's assertion that "revenue was to be earned by ACCG" suggests that their arrangement runs afoul of the non-profit business laws, review of the record as a whole suggests otherwise.  At the very least, Mr. Gold's testimony suggests that

---

[17]    Defendant's Exhibit A: Gold Depo., pp. 6-7, 43-44
        (Docket No. 173).

[18]    Id. at pp. 42, 45.

[19]    Id. at pp. 42-43.

there is a genuine issue for trial and summary judgment is therefore unwarranted.

In this manner it also appears that George is unable to demonstrate that the oral agreement as alleged by White is violative of the Public Welfare Act.[20]  Not only does Mr. Gold's testimony that there is nothing illegal or improper about the subcontractor relationship between ACG and ACCG seemingly speak to the Public Welfare Act as well as the non-profit corporation laws but, as George himself has allowed, the Independent Contractor Agreement, which appears consistent with the oral

---

[20]    George cites to two provisions that the oral agreement allegedly violates.  62 P.S. § 1407 (a) provides that: "It shall be unlawful for any person to: ...  (2) Solicit or receive or to offer or pay any remuneration, including any kickback, bribe or rebate, directly or indirectly, in cash or in kind from or to any person in connection with the furnishing of services or merchandise for which payment may be in whole or in part under the medical assistance program or in connection with referring an individual to a person for the furnishing or arranging for the furnishing of any services or merchandise for which payment may be made in whole or in part under the medical assistance program.  And 62 P.S. § 1402(a) provides that: "As a condition of participation in the medical assistance program, a medical facility shall be required to disclose to the department upon execution of a new provider agreement or renewal thereof the name and social security number of any person who has a direct or indirect ownership or control interest of five percent or more in such medical facility ...."

agreement at issue, was approved by the Pennsylvania Bureau of Professional Integrity and the Department of Public Welfare.[21]

Moreover, George has not argued how the parties' alleged agreement violates the Public Welfare Act, but merely concludes that it does so because it "illegally shares remuneration and illegally shares profits between facilities which are not separate in ownership." Defendant's Brief, p. 13. As discussed above, however, the agreement between the parties appears only to contemplate an arrangement whereby ACG would provide wraparound staff to ACCG and that ACCG would then pay a fee, at a commercially reasonable rate, to ACG for allowing ACCG to use its staff, which does not appear to run counter to the Public Welfare Act. As such, it appears that George's motion for summary judgment regarding the breach of contract claim brought at Count II is properly denied.

George also argues that he is entitled to summary judgment on White's claim for fraud brought at Count I of the Complaint because she is unable to establish that she justifiably relied upon George's alleged representation that he would abide by their oral agreement.

---

[21]    See Defendant's Exhibit B: Independent Contractor Agreement (Docket No. 161).

Under Pennsylvania law, fraud will be found where the plaintiff has established: (1) a misrepresentation; (2) a fraudulent utterance of it; (3) the maker's intent that the recipient be induced thereby to act; (4) the recipient's justifiable reliance on the misrepresentation; and (5) damage to the recipient proximately caused. Sevin v. Kelshaw, 417 Pa. Super. 1, 9, 611 A.2d 1232, 1236 (1992). Further, "[t]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him." Sprinturf, Inc. v. Southwest Recreational Industries, Inc., 281 F. Supp. 2d 784, 785-86 (E.D. Pa. 2003), quoting Restatement (Second) of Torts § 541 (1977).

In the instant case, George argues that White was not justified in relying on George's representations that he would abide by their agreement regarding how ACG and ACCG were to operate because they were in conflict with the advice given to her by her attorney and with the Independent Contractor Agreement ultimately entered into between ACG and ACCG.[22] George first points to the fact that White has alleged that she and George agreed that ACG and ACCG were to be "intertwined" and subject to

---

[22]    George also argues that White could not have relied upon George's representations set forth in their alleged oral agreement since any such agreement was illegal. Having already rejected George's argument in this regard, however, we need not address it again here.

her control, whereas the letter from attorney Gold stated that the two entities were to be entirely separate and that neither she nor George could control ACCG.[23]

Review of the record, however, does not, in our view, suggest the conflict that George would have us find. First, although it appears undisputed that ACCG and ACCG were to be separate entities with separate employees and separate finances, it also cannot be disputed that there was a relationship between the two organizations. Indeed, it appears clear that it was White and George who decided to create ACCG in order to provide wraparound services to their clients, that the two entities enjoyed centralized services, that ACCG was to provide the staff for "fee schedule" services to ACCG for which ACCG would pay ACCG, and that White and George, the sole shareholders of ACCG, were to share in the management of ACCG. Thus, it appears clear that there is a fair amount of consanguinity between the two entities.

Indeed, Mr. Gold testified at his deposition that it was understood that ACCG and ACCG were related parties, which, in fact, dictated that a written agreement had to be executed.[24]

---

[23]    See Defendant's Exhibit A: Gold's January 5, 1999 Letter.

[24]    See Gold Depo., pp. 41-42, 56-57, 85, 187-88, 194-94.

While, perhaps the word "intertwined" may connote a somewhat greater relationship than Mr. Gold had advised is healthy, we cannot say as a matter of law that White's use of the word to describe her agreement with George regarding ACCG and ACCG's relationship is so contrary to Gold's advice that she could not have justifiably relied on George's alleged representation.

Similarly, White's reference in the Complaint that she and George "controlled" ACCG and ACCG, does not appear to be in such conflict with Gold's advice regarding the corporate structures that White could not have justifiably relied on George's alleged representation to abide by their agreement.[25] First, we note that the import of paragraph 56 is White's assertion that she and George understood that ACCG would always supply the staff to ACCG, and not their understanding of who controlled ACCG.

Second, it is apparent from Gold's "advice" letter that he never used the word "control" or specifically stated that White and/or George would not or could not control ACCG.  While Gold did advise that neither of them owned ACCG and that they were, in fact, employees of ACCG, he also allowed that White was to be the Director of Administration of ACCG and thus responsible for supervising marketing actions and human resources as well as

---

[25]    See Complaint ¶ 56.

15

developing referral resources and supervising some of the
centralized services.  George was to be the Executive Director in
charge supervising the medical director and clinical supervisor.
Both parties were responsible for developing policies and
procedures for training,  personnel, billing, authorization and
control, scheduling as well as clinical policies and procedures.
Moreover, Gold stated in his letter dated January 12, 1999, that
no business expansion or changes would be made without both
parties agreeing.[26]  This advice regarding how ACCG was to
operate certainly suggests that the parties were to exercise some
"control" over ACCG even if as employees and/or managers.
Indeed, Mr. Gold testified at his deposition that "there was
significant control exercised by persons involved with the clinic
regarding the contract for the provision of wraparound staff."[27]
Thus, we do not find White's use of the word "control" contrary
to Gold's advice or fatal to her claim.

George also argues that White's understanding that
revenue earned by ACCG was to be passed through to ACCG is not
justifiable in light of her attorney's advice that business could
not be done that way.  As previously discussed, however, the
corporate relationship was structured in such a way that ACCG was

---

[26]    Defendant's Exhibit A: Gold's January 12, 1999
        Letter (Docket No. 161).

[27]    Gold Depo., pp. 56-57.

16

merely being compensated for providing its staff to ACCG and that it was the revenue earned by ACCG that was being distributed to ACG's shareholders.  This is precisely the arrangement contemplated in Gold's advice letter and in the Independent Contractor Agreement and it is this arrangement that White complains George has breached.[28]

Lastly, George contends that White's claim that she and George agreed that ACCG would always supply the staff to ACCG is also contrary to Gold's advice.  Gold's letter, however, states only that there must be a written agreement between the two entities that states what services ACCG shall provide to ACCG and for what compensation which is precisely what the Independent Contractor Agreement states.  Neither Gold's letter nor the Independent Contractor Agreement makes any reference to a "non-exclusive" relationship.  Further, Gold specifically testified that although the written agreement could not say that it was an exclusive contract, "if the fact was that they didn't have contracts with any other temporary staffing agency, that's fine."[29]  And when pressed about whether he knew that ACCG would not enter into a contract to provide services to another clinic and that ACCG would not enter into an agreement with another

---

[28]     Complaint ¶ 36; Defendant's Exhibit A: Gold's
         January 5, 1999 Letter.

[29]     Gold Depo., p. 231.

provider of employees, Gold merely reiterated that "[a] document cannot state that there is an exclusive arrangement between related parties."[30]  Indeed, when asked whether it was true that part of the arrangement with ACCG was that it would not look to another agency to provide staffing services, Mr. Gold responded in the affirmative.[31]  Certainly, under these circumstances, it cannot be said that White's understanding that ACCG would always supply the staff to ACCG was contrary to Gold's advice or that she was unjustified in relying on George's alleged representation to abide by that agreement.  It therefore appears that the motion for summary judgment as to White's claim for fraud brought at Count I of the Complaint is properly denied.

George next argues that White should be precluded from seeking monetary damages for the alleged loss of her investment in ACCG resulting from George's actions since the issue regarding the propriety of her removal from ACCG has already been litigated in state court.  We disagree.

The law is not in dispute.  The doctrine of issue preclusion "ensures that 'once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a

---

[30]    Id. at pp. 256-57.

[31]    Id. at p. 258.

different cause of action involving a party to the prior
litigation.'" Burlington Northern R. Co. v. Hyundai Merchant
Marine Co., Ltd., 63 F.3d 1227, 1231 (3d Cir. 1995), quoting
Montana v. United States, 440 U.S. 147, 153 (1979).   The
doctrine will be applied where: (1) the issue sought to be
precluded is the same issue involved in the prior action; (2)
that issue was actually litigated; (3) it was determined by a
final and valid judgment; and (4) the determination was essential
to the prior judgment.  Id. at 1231-32.

          Here, it does not appear that the doctrine of issue
preclusion is properly applied since, contrary to George's
assertion, it is clear from the record that the issue of whether
or not White was properly removed form ACCG has not been
litigated by the state court.  Indeed, review of the record
demonstrates that the state court dismissed the action prior to
litigating the issue of White's wrongful termination.[32]  The
dismissal was premised on White's admission that she was
operating a company called Family Child Counseling Services
("FCCS") that was in direct competition with ACCG.[33]  Finding
that there would be a clear conflict of interest if White were to

---

[32]    See Defendant's Exhibit E: White v. ACCG, No.
        1999-52469 (Ct. Common Pleas, Mercer Co. March
        29, 2004)(Opinion, J. Dobson) (Docket No. 161)..

[33]    Id. at pp. 4-5.

prevail and remain involved in FCCS, the Court declined to litigate the issue until White "place[d] upon the record her irrevocable choice as to whether or not she will divest herself of her holdings in any entity competition [sic] with the defendant A.C.C.G. if a verdict in her favor is returned."[34]  In this manner, the Court could "insure that the litigation involved a genuine controversy and was not an intellectual exercise pursued solely to cause disruption."[35]  White, it appears, was unwilling to make such an election and, consequently, the Court dismissed her suit prior to trial and before any factual determinations regarding her termination were made.

Under these circumstances, it cannot be said that the issue regarding White's discharge was "actually litigated" as is required for issue preclusion to apply.  Burlington Northern R. Co. v. Hyundai Merchant Marine Co., Ltd., 63 F.3d at 1232.  While it may be true that White had the opportunity to litigate the issue, the fact that she forfeited that opportunity does not render it "litigated" for purposes of issue preclusion.[36]    See

---

[34]    Id. at 5.

[35]    Id. at 8-9.

[36]    In this manner, we find George's assertion that "[e]ssential to the Court's dismissal of that suit was its determination that White was not entitled to reinstatement and damages as a result of her competitive conduct" completely unsupported by the record.

Kaller's Inc. v. John J. Spencer Roofing, Inc., 388 Pa. Super. 361, 365-66, 565 A.2d 794, 796 (1989) (emphasis in original) (Finding that "despite the fact that the parties had the *opportunity* to litigate their cross-claims, there is no record evidence to suggest that the issue of Spencer's liability to Kaller was *actually* litigated" where the cross-claims were withdrawn after the presentation of testimony.)   As such, it appears that White's claim for damages stemming from George's alleged breach of the parties' oral agreement is properly before the Court.

        Finally, George asks that, in the event summary judgment is granted on White's breach of contract and fraud claims, this matter be stayed pending resolution of the parallel state court actions in Mercer County, Pennsylvania.  Because, however, we have declined to grant summary judgment on White's breach of contract and fraud claims, there appears to be no basis upon which to grant a stay and that motion is properly denied as well.

        An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

```
MARY L. WHITE,                 )
          Plaintiff,           )
                               )
          vs.                  )    Civil Action No. 00-2466
                               )
SHAYEN A. GEORGE, M.A.,        )
          Defendant.           )    RE: Docket Nos. 160-1 & 160-2
```

## ORDER

AND NOW, this 25th day of August, 2005, for the reasons stated in the accompanying Opinion, IT IS HEREBY ORDERED that the Motion for Partial Summary Judgment (Docket No. 160-1) and the Motion for Stay (Docket No. 160-2) submitted on behalf of the defendant are DENIED.

By the Court,

/s/ Amy Reynolds Hay
AMY REYNOLDS HAY
United States Magistrate Judge

```
cc:  Stanley M. Stein, Esquire
     Beth S. Mills, Esquire
     David S. Bloom, Esquire
     Feldstein, Grinberg, Stein & McKee
     428 Boulevard of the Allies
     Pittsburgh, PA 15219

     Richard B. Sandow, Esquire
     David M. Huntley, Esquire
     John P. Corcoran, Esquire
     Jones, Gregg, Creehan & Gerace
     411 Seventh Avenue
     Suite 1200
     Pittsburgh, PA 15219-1905

     Brian T. Must, Esquire
     Steven Petrikis, Esquire
     Michael P. Robic, II, Esquire
     Metz Lewis
     11 Stanwix Street
     18th Floor
     Pittsburgh, PA 15222
```