```
 1            told you that?
 2  A.        Gregory Klink.
 3  Q.        Who is Gregory Klink?
 4  A.        He was an attorney for Jones Gregg Creehan &
 5            Gerace.
 6  Q.        Who was the expert that you were going to have
 7            review the whole contract?
 8  A.        This Independent Contractor's Agreement?
 9  Q.        Yes.
10  A.        Greg Klink also.  And the reason for that is --
11                    MR. PETRIKIS:  Just be careful that
12            you do not disclose confidential
13            attorney-client communications.  I think your
14            answers thus far are appropriate so that
15            Mr. Stein understands your concern relating to
16            the nonprofit aspect of the clinic.  I don't
17            want you to talk about substance of
18            conversations with Mr. Klink.
19                    THE WITNESS:  Sure.  Thank you.  It
20            was really kind of my feeling that one person
21            needed to review this entire stack of documents
22            because they all fit together just like parts
23            of a machine.  And I'm an engineer by
24            education, and I know you just don't change one
25            gear over here on the left without affecting
```



```
 1        something else on the right.  So all of these
 2        things needs -- all of these documents needed
 3        to integrate together.  And that's why --
 4        that's why Greg Klink would be reviewing the
 5        whole thing.
 6  BY MR. STEIN:
 7  Q.    When did you give them to Greg Klink to review?
 8  A.    Prior to the March 5th, 1999, meeting
 9        initially.
10  Q.    How long prior?
11  A.    My guess would be about a week prior.
12  Q.    Why didn't you wait for Klink's review before
13        you signed it?
14                MR. PETRIKIS:  Object to the form.
15        Tom didn't sign it.
16  BY MR. STEIN:
17  Q.    Why didn't you wait for Klink to review it
18        before Fred George was authorized to sign it on
19        behalf of ACCG?
20                MR. SANDOW:  By it do you mean --
21                MR. STEIN:  The Independent
22        Contractor Agreement.
23                MR. PETRIKIS:  As it was presented to
24        the board, not as it is in Exhibit 2.
25                MR. STEIN:  Well, I'm not accepting
```

30

```
 1      any of your qualifications on my question.
 2      I've asked him why --
 3              MR. PETRIKIS:  Then I'm objecting and
 4      directing him not to answer.  What document are
 5      we talking about?
 6              MR. STEIN:  We're talking about
 7      Exhibit 2.
 8  BY MR. STEIN:
 9  Q.  Why didn't you wait until Klink reviewed it
10      before authorizing Fred George to sign it?
11              MR. PETRIKIS:  Objection to form.
12      His testimony was that he never authorized Fred
13      George to sign something that has the
14      handwriting from pages 3 through 6.  Well,
15      actually page 3 was handwritten on there, but
16      certainly not page 4.  So tell him what
17      document you're talking about.
18              MR. STEIN:  The document that I'm
19      talking about is whatever document he believes
20      Fred George was authorized to sign.
21  BY MR. STEIN:
22  Q.  Why did you have Fred George sign the thing if
23      you were going to have Klink review it?
24              MR. PETRIKIS:  Object to the form.
25      You can go ahead and answer.
```

                                31

1          MR. SANDOW:  Do you understand the
2    question?
3          THE WITNESS:  Yes.  The reason was
4    that -- well, first of all, Greg Klink had
5    reviewed prior to this meeting numerous of the
6    documents and actually had prepared --
7          MR. SANDOW:  Now we're going to stop.
8    You're getting into attorney-client.  Let's
9    take a break so that we can make sure we don't
10   do that.
11                   - - - -
12   (There was a recess in the proceedings.)
13                   - - - -
14         THE WITNESS:  Just to be crystal
15   clear --
16         MR. PETRIKIS:  Why don't we have the
17   question read back.
18         COURT REPORTER:  Question:  Why did
19   you have Fred George sign the thing if you were
20   going to have Klink review it?
21         MR. PETRIKIS:  And I object to the
22   form.  Go ahead.
23         MR. CORCORAN:  I join that objection.
24   Go ahead.
25         THE WITNESS:  Well, the bottom line

```
 1     reason is that all of these documents which we
 2     were approving needed to be submitted to the
 3     state very quickly, either the next day or by
 4     the end of the week, or there was a very big
 5     time constraint.  And these documents had to be
 6     submitted on time; otherwise the clinic might
 7     not obtain its license to do business in the
 8     state.
 9              So we intended -- everybody intended
10     on revisiting this at the very next meeting.
11     And the primary reason for that, among other
12     things, was -- but the primary reason was the
13     prices on page 2.  I mean, we had all agreed
14     ahead of time that those were plug-in numbers,
15     and we absolutely had to discuss that at the
16     next meeting.  So we were going to discuss it
17     at the next meeting anyway.  We were going to
18     agree to something on that at the next meeting.
19     So we might as well do the termination at that
20     next meeting and potentially have the entire
21     contract redrafted prior to that meeting.
22 BY MR. STEIN:
23 Q.  So you provided the copy of the documents, the
24     Independent Contractor's Agreement and a bunch
25     of other documents, to Mr. Klink?
```

```
1  A.    Yes.
2              MR. CORCORAN:  Wait a minute.  That
3        wasn't the testimony.
4              MR. SANDOW:  Can we have the question
5        read back?
6              MR. STEIN:  What question are we
7        having read back?  He answered the question.
8              THE WITNESS:  Wait.  I want to
9        correct it.
10             MR. SANDOW:  I just want to hear the
11       question.  Let's have it read back.
12             COURT REPORTER:  Question:  So you
13       provided the copy of the documents, the
14       Independent Contractor's Agreement and a bunch
15       of other documents, to Mr. Klink?
16             THE WITNESS:  Technically I didn't
17       really -- they weren't in my hand to provide
18       them to Mr. Klink.  Shayen George actually
19       provided a stack of documents to Mr. Klink in
20       connection, you know, with ACCG.  I'm assuming
21       that one of those agreements in that big stack
22       was the Independent Contractor Agreement, but
23       it may not have been.
24 BY MR. STEIN:
25 Q.    How did you know --
```

```
 1              MR. CORCORAN:  Wait a minute.  I just
 2       want to instruct the witness do not assume
 3       anything, only what you know.  Do not make any
 4       assumptions.
 5              THE WITNESS:  Okay.
 6  BY MR. STEIN:
 7  Q.   How do you know that Shayen George provided a
 8       stack of documents to Mr. --
 9  A.   Do we need to correct it?
10              MR. CORCORAN:  Do you want to correct
11       your response, your last response?
12              THE WITNESS:  Okay.  My response to
13       the last question I am not sure that the
14       Independent Contractor Agreement was in that
15       stack of documents.
16  BY MR. STEIN:
17  Q.   How do you know that Shayen George provided a
18       stack of documents to Klink?
19  A.   Because I was there.
20  Q.   You were there when he provided them to him?
21  A.   Yes.
22  Q.   You were at a meeting with Mr. Klink and Shayen
23       George when those documents were provided?
24  A.   Yes.  I was at the meeting with Mr. Sandow, and
25       Shayen George arrived at that meeting about 2
```

```
1         hours after that meeting commenced, and then
2         Mr. Klink arrived about 5 minutes after that.
3    Q.   Who else was at that meeting?
4    A.   Just the four of us.
5    Q.   When did that meeting take place?
6    A.   Approximately a week prior to the first board
7         meeting, maybe two weeks prior. But I think it
8         was one week prior to.
9    Q.   Did Mary White know of that meeting?
10   A.   She may have. I don't know.
11   Q.   You don't know whether she did or not?
12   A.   I really don't know. I assumed that she --
13              MR. CORCORAN: Don't assume.
14              THE WITNESS: There's certainly no
15        reason to hide it from her, but I don't know.
16   BY MR. STEIN:
17   Q.   Did anybody tell her about it?
18   A.   You would have to ask Shayen George whether he
19        did.
20   Q.   So the meeting took place between you,
21        Mr. Sandow, Mr. Klink, and Mr. Shayen George
22        about a week prior to the meeting at which the
23        Independent Contractor Agreement was signed by
24        Fred George?
25   A.   A week prior to that meeting, yes.
```

```
 1 Q.    And do you know what the other documents were
 2       that were provided to Mr. Klink?
 3              MR. PETRIKIS:  Object to the form.
 4              MR. CORCORAN:  Object to the form.
 5       What documents are you talking about?
 6              MR. STEIN:  The stack of documents
 7       that he saw being provided to Mr. Klink.
 8              MR. PETRIKIS:  Object to the form.
 9       You can go ahead and answer.
10 A.    One of them I know for sure were the corporate
11       bylaws.
12 BY MR. STEIN:
13 Q.    What else?
14 A.    That's about the only one that I really know
15       for sure about because --
16              MR. SANDOW:  You can't talk about the
17       conversation.
18              THE WITNESS:  Okay.
19 BY MR. STEIN:
20 Q.    Who engaged the services of the Sandow law
21       firm?
22              MR. CORCORAN:  Objection.
23       Irrelevant.  I'm not going to disclose -- I
24       direct him not to answer as to attorney-client
25       privilege.
```

```
 1  BY MR. STEIN:
 2  Q.   Did ACCG hire Mr. Sandow's law firm?
 3              MR. CORCORAN:  Objection.  I direct
 4       the client not to answer.
 5              MR. STEIN:  And the objection is
 6       based on what?
 7              MR. CORCORAN:  Attorney-client
 8       privilege and irrelevant.
 9              MR. STEIN:  Attorney-client privilege
10       with regard to who hired the Sandow firm?
11              MR. CORCORAN:  Correct.
12              MR. STEIN:  Attorney-client privilege
13       with regard to whether or not ACCG hired --
14              MR. CORCORAN:  My objection is
15       attorney-client privilege.  I'm not going to
16       get into the substance of it.  I will direct my
17       client not to answer.  It's beyond the scope
18       and irrelevant.
19  BY MR. STEIN:
20  Q.   Are you aware that ACCG paid the Sandow law
21       firm for the review of the documents by
22       Mr. Klink?
23              MR. CORCORAN:  Objection.  I'll
24       instruct the client not to answer.  I request
25       that we go back to the designations that
```